75-10/PJG/GMV
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In the Matter of the Complaint of | **ECF CASE** |
| MS "ANGELN" GMBH & CO. KG, and ANGELN SHIPPING COMPANY LTD., as Owner and Bareboat Charterer of the MV ANGELN, for Exoneration from or Limitation of Liability | 10 Civ. 4820 (GBD) |
| Catlin Insurance Company (UK) Limited, Claimant/Third-Party Plaintiff v. Bernuth Lines Ltd., Third-Party Defendant/ Fourth-Party Plaintiff v. Brise Bereederungs GmbH & Co. KG, Fourth-Party Defendant | **DECLARATION OF NICOLAS MONOCANDILOS** |

Nicolas Monocandilos declares and states as follows:

1.      I am the Executive Vice President of Bernuth Agencies, Inc., general agent for Bernuth Lines Ltd. ("Bernuth").

2.      I submit the following declaration in support of Bernuth's opposition to Fourth-Party Defendant Brise's motion to dismiss.

3.      Except as otherwise set forth below, the information contained herein is based upon my personal knowledge and involvement with this matter.

4.      The M/V ANGELN was chartered by Bernuth under a time charter party dated December 22, 2008. (*See* Ex. 1.)

5.      Prior to the finalization of the charter party, Bernuth had requested an opportunity to inspect the vessel, meet the crew, etc.

6.      This request was communicated through S. Danoff USA Ltd. ("Danoff"), a US-based charter broker.  As far as we understand based upon the fact that Danoff is the only charter broker identified in the Charter, Danoff was acting as the sole or joint broker for both Bernuth and the Owner.

7.      The vessel owners' managers authorized the inspection of the vessel, and the vessel was made available for inspection at Fort Lauderdale.   Representatives of Bernuth attended onboard the vessel, were given access to the ship for purposes of a survey and were allowed to interview the crew.

8.      The details about the ship, her carrying capacity, speed, consumption, etc., were provided to us (via Danoff) by Brise and later incorporated into the terms of the charter party. (See Ex. 1 – vessel specifics.)

9.      In addition, it was represented to Bernuth at the time of charter that the vessel was under German management. (*See* Ex. 1 at Rider Clause 28.)

10.     Under the terms of the Charter, the Owners agreed, via their managers, to pay a commission to Danoff at a rate of 1.5% of the monthly charter hire. (S*ee* Ex. 1 at the Commissions Clause).  The payment of commission was never made by Bernuth, so presumably it was paid by Owners, via their managers, to Danoff in the United States each month, although it is unclear to me which Brise entity arranged these payments.

11.     In addition, and in representations made to Bernuth (via Danoff) to induce Bernuth to charter the vessel, Brise confirmed that the vessel had been previously employed in

trade to the U.S., and this fact was included in the charter party.  (*See* Ex. 2, charter party fixture recap dated December 16, 2008, confirming vessel trading to Florida "for many years".)

12.     In addition, Brise confirmed (via Danoff) that all crew members held valid visas for calling at the U.S. ports.

13.     Bernuth was called upon by Brise on at least one occasion to provide a letter of guarantee to facilitate Brise's crewing agent's ability to secure additional US visas for the crew.

14.     In the charter, it was negotiated and agreed, again via Danoff, that the vessel would be delivered into the Bernuth service in the United States on her arrival off the pilot station in Miami. (*See* Ex. 1, delivery clause and Ex. 2, Recap at p. 2.)

15.     It was also agreed that that the vessel's re-delivery would occur in US waters. (*See* Ex. 1, Redelivery Clause.)

16.     It was further agreed that any claims would be subject to New York arbitration, which the parties have now agreed to substitute with New York litigation. (*See* Ex. 1, Clause 98 in Rider.)

17.     Danoff has also confirmed that representatives of Brise have visited their offices on marketing trips and have also visited other US-based charterers and brokers in an effort to generate business (charters) for vessels that are managed within the Brise fleet.

18.     Further, Brise routinely ships spares and parts to the vessel via Miami and has asked Bernuth on occasion to assist and/or facilitate the delivery of items/spares to the ship via Miami or from other US locations.

19.     Local repair vendors also confirm that Brise has contracted for repairs from US based repair facilities.

I certify under penalty of perjury that the foregoing is true and correct.

3

Executed on August 10, 2011

_____
NICOLAS MONOCANDILOS

4